## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZYPPAH, INC. d/b/a ZYPPAH; SLEEP CERTIFIED INC.; GREENBURG D.D.S. P.C.; and JONATHAN GREENBURG,<br><br>                    Plaintiffs,<br>   v.<br><br>ACE FUNDING SOURCE, LLC a/k/a ACE FUNDING SOURCE;  HANOCH GUTTMAN a/k/a HENRY GUTTMAN; UNITED SECURED CAPITAL, LLC; GREEN NOTE CAPITAL PARTNERS, INC. a/k/a GREEN NOTE CAPITAL PARTNERS, LLC, GREEN NOTE CAPITAL PARTNERS, and GREEN NOTE CAPITAL; MERCHANT ADVANCE; GABRIEL MANN; ISAAC KASSAB; ALBERT GINDI; JORDAN CAMPBELL; JOHN AND JANE DOES 1 THROUGH 100; and JOHN DOE COMPANIES 1 THROUGH 100,<br><br>                  Defendants. | Civil Action No. 19-1158 (ALC)<br><br><br><br><br><br>**VERIFIED AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Zyppah, Inc. d/b/a Zyppah, Sleep Certified Inc., Greenburg D.D.S. P.C., and Jonathan Greenburg (each a "**Plaintiff**" and collectively, the "**Plaintiffs**"), by and through their attorneys, Ice Miller LLP, as and for their verified amended complaint ("**Complaint**") against the above-captioned defendants (each a "**Defendant**" and collectively, the "**Defendants**") allege, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     This case is far more than a two-party contract dispute.   Through mere inadvertence or a moment of unintentional candor, in a March 19, 2019 filing in this Court [Dkt. No. 20], Defendants disclosed that their business is an illicit enterprise, based in fraud. This

disclosure triggered an investigation by Plaintiffs that has led to this amended and expanded Complaint.

2.      Defendants have operated as an enterprise of individuals and entities fraudulently inducing merchants, like Plaintiffs, to "borrow" funds or "sell" their future "Receipts" to Defendants pursuant to agreements they never intended to (and did not actually) honor, later wrongfully retaining and converting the merchants' funds.

3.      These facts are incontrovertible: (a) Defendants aggressively solicited Plaintiffs' business – Plaintiffs did not seek out Defendants; (b) Defendants, by and through Albert Gindi, Isaac Kassab and others, induced Plaintiffs to agree to the transaction by promising, pursuant to "letters of guarantee," to provide a substantial "discount" of $232,050.00 (more than two-thirds of the "interest" under the transaction) once certain weekly payments were made by Plaintiffs; (c) Plaintiffs made the weekly payments entitling Plaintiffs to the "discount"; (d) Plaintiffs thereafter obtained a conventional loan to repay the balance due Defendants that required Defendants to release their liens; (e) Defendants misrepresented that they held liens on Plaintiffs' property and refused to release their purported liens until *all* amounts stated were paid, including the amount of Defendants' purported "discount," while contemporaneously promising, in writing, to repay the amount of the "discount"; (f) Defendants induced Plaintiffs to pay the "discount" by promising to refund the "discount"; (g) despite the express language of the "letters of guarantee" that require a combined "payback" of $862,500 (reflecting the 15% rate that Plaintiffs were promised) on the $750,000 Plaintiffs borrowed from Ace Funding and Green Note, Defendants withdrew from Plaintiffs' bank accounts and were paid $1,107,675 over fewer than three months (late October 2018 – early January 2019), translating to interest of nearly 50% on the transaction; (h) despite repeated demands, Defendants have not repaid the "discount"; and, (i) after Plaintiffs commenced this action, Defendants Green Note and United Secured

**admitted** in writing to this Court that the "letters of guarantee" were, in fact, **fraudulent** and that the named "C.E.O." signatories of the letters of guarantee were never officers or employees of Defendants [Dkt. No. 20].

4. After being alerted to the fraud, Plaintiffs discovered that (a) United Secured, Green Note and Ace Funding's business addresses are actually a Federal Express mailbox location, a Brooklyn pizza shop, and a Florida fitness center; (b) Defendants made other material misrepresentations (and continue to do so on their websites) to induce Plaintiffs into the transaction (particularly in the letters of guarantee they now disavow), such as expressly professing to be in business for "more than 20 years," when in fact, Ace Funding was incorporated less than 4 years ago, Green Note was incorporated a mere 10 months before the transaction and United Secured was incorporated less than a year before, in order to mislead Plaintiffs into trusting the legitimacy of Defendants' "business"; (c) Defendants never actually held any liens on Plaintiffs' property; and, (d) many other merchants have also asserted claims against Defendants, Ace Funding, Guttman, and their affiliates based on fraud and violations of Racketeer Influenced and Corrupt Organizations laws, evidencing a national pattern and practice by Defendants to prey upon unwitting merchants, obtaining access to and gouging their bank accounts.

5. Defendants' fraudulent representations enabled them to obtain access to Plaintiffs' federally insured bank accounts, from which they wrongfully withdrew excessive funds, contrary to the terms of any of the alleged agreements and applicable law.

6. Absent judicial intervention and the appointment of a receiver, Plaintiffs do not believe Defendants will cease their fraudulent conduct or repay the funds Defendants have improperly (and illegally) taken and withheld. Nor can Plaintiffs be certain that Defendants have the capacity to return Plaintiffs' wrongfully withheld funds because, based on the sheer number

of entities through which Defendants appear to conduct "business" (see ¶ 66 below), Defendants may be engaged in a "Ponzi scheme" in which Defendants relend the funds obtained from merchants they have defrauded in one transaction to other unwitting merchant-victims in the next transaction (through a newly created entity they represent to have been in business "for decades"), retaining ill-gotten profits to the detriment of Plaintiffs and the public at large.

**THE PARTIES**

*A. Plaintiffs*

7.      Plaintiff, Zyppah, Inc. d/b/a Zyppah ("**Zyppah**") is a Nevada corporation that is and was, at all relevant times, duly authorized and licensed to conduct business in the State of New York.  Zyppah's principal place of business is located at 701 South Carson Street, Suite 200, Carson City, Nevada 89701.

8.      Plaintiff, Sleep Certified Inc. d/b/a Sleep Certified ("**Sleep Certified**") is a Nevada corporation with its principal place of business located at 701 South Carson Street, Suite 200, Carson City, Nevada 89701.

9.      Plaintiff, Greenburg D.D.S. P.C. d/b/a Greenburg D.D.S. ("**Greenburg D.D.S.**"), is a professional corporation organized in the State of California with a principal place of business located at 24981 Palmilla Drive, Calabasas, California 91302.

10.      Plaintiff, Jonathan Greenburg ("**Greenburg**") is an individual who, at all relevant times, resides in and is a citizen of California.  Greenburg is a dentist and sleep specialist doctor, as well as a leading inventor of oral sleep aids.  Greenburg is the principal and owner of Zyppah, Sleep Certified, and Greenburg D.D.S., which are engaged in the retail sale of oral sleep aids designed by Greenburg.

### B. Defendants

11.     On information and belief Defendant, Ace Funding Source LLC ("**Ace Funding**") is a New York limited liability company with its principal place of business located at 366 North Broadway, Jericho, New York 11753.

12.     On information and belief Defendant, Green Note Capital Partners Inc. a/k/a Green Note Capital Partners, LLC, Green Note Partners and Green Note Capital (collectively, "**Green Note**") is a Delaware corporation with its principal place of business located at 2367 McDonald Avenue, Brooklyn, New York 11223.

13.     On information and belief Defendant, United Secured Capital, LLC ("**United Secured**") is a New York limited liability company with its principal place of business located at 2367 McDonald Avenue, Brooklyn, New York 11223.

14.     On information and belief Defendant, Merchant Advance ("**Merchant Advance**") is a New York limited liability company with its principal place of business located at 366 North Broadway, Jericho, New York 11753.  Defendants Ace Funding, Green Note, United Secured, and Merchant Advance are collectively referred to herein as the "**Entity Defendants**."

15.     On information and belief Defendant, Albert Gindi ("**Gindi**") is an individual who, at all relevant times, resides in and is a citizen of New York and maintains a principal place of business at 2367 McDonald Avenue, Brooklyn, New York 11223.  At all times relevant, Gindi was, is, and represented himself to be, an officer, employee and/or agent acting on behalf of Defendants, Ace Funding, Green Note, United Secured and Merchant Advance.

16.     Defendant, Isaac Kassab ("**Kassab**") is an individual who, at all relevant times, maintains a principal place of business at 2367 McDonald Avenue, Brooklyn, New York 11223.  At all times relevant, Kassab is, was, and represented himself to be, an officer, employee and/or

agent acting on behalf of Defendants, Ace Funding, Green Note, United Secured and Merchant Advance.

17.     On information and belief Defendant, Jordan Campbell ("**Campbell**") is an individual who maintains a principal place of business at 2367 McDonald Avenue, Brooklyn, New York 11223. At all times relevant, Campbell is, was, and represented himself to be, an officer, employee and/or agent acting on behalf of Defendants, Ace Funding, Green Note, United Secured and Merchant Advance.

18.     On information and belief Defendant, Hanoch Guttman a/k/a Henry Guttman ("**Guttman**") is an individual who resides in and is a citizen of New York and maintains a principal place of business at 366 North Broadway, Jericho, New York 11753.  Guttman is a managing member of Defendant, Ace Funding.

19.     On information and belief Defendant, Gabriel Mann ("**Mann**") is an individual who resides in and is a citizen of New York and maintains a principal place of business at 2367 McDonald Avenue, Brooklyn, New York 11223.  Mann is an owner of Green Note and United Secured.  Defendants Gindi, Kassab, Guttman, Campbell, and Mann shall be referred to herein as the "**Principal Perpetrators**."

20.     Defendants, John and Jane Does 1 through 100 are fictitious individuals who are not specifically named defendants, whose names and addresses are unknown to Plaintiffs at this time but who may be identified during discovery in this matter, and who are responsible to Plaintiffs for the claims set forth herein.

21.     Defendants, John Doe Companies 1 through 100 (collectively, the "**John Doe Companies**") are fictitious sole proprietorships, companies, limited liability companies, partnerships, corporations and/or other companies/entities who are not specifically named defendants, whose names and addresses are unknown to Plaintiffs at this time but who may be

identified during discovery in this matter, and who are responsible to Plaintiffs for the claims set forth herein.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action under 28 U.S.C. § 1332, as Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

23.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961, *et seq.* (the Racketeer Influenced and Corrupt Organizations "RICO" Act) because they arise under the laws of the United States.  Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over any state law and non-RICO claims because they are so related to the RICO claims as to form part of the same case and controversy.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (d) because Defendants have their principal place of business in New York and Defendants have sufficient contacts to subject them to personal jurisdiction in this Court.

25.     Additionally, this Court has jurisdiction and venue over this action because Defendants consented to jurisdiction and venue in their Loan Agreements with the Plaintiffs.

## FACTS COMMON TO ALL COUNTS

### A.  The "Merchant Cash Advance" Transactions

26.     In or about July 2018 and over the course of several months, Kassab, on behalf of Defendants, repeatedly and aggressively called and emailed Jerry Washburn ("**Washburn**"), the Chief Financial Officer of Plaintiff, Zyppah, offering merchant cash advances.

27.     At all relevant times, Kassab and Gindi emailed Washburn using email addresses (isaac@unitedsecuredcapital.com and albertg@unitedsecuredcapital.com) that identified them as officers, employees or agents of Defendant, United Secured. Kassab's emails identified him as

"Funding Manager" of United Secured at its Brooklyn, New York office address and Gindi's emails identified him as "Funding Director" of United Secured at its same Brooklyn, New York office address.

28.     On or about October 15 through 17 of 2018, after receiving many calls over many months from Kassab, on behalf of Defendants, Washburn, on behalf of Plaintiffs, succumbed to Kassab's solicitation and began negotiating the terms of a merchant cash advance transaction with Gindi and Kassab.

29.     From the very onset, Plaintiff, Zyppah advised Defendants that any merchant cash advance transaction it enters cannot have an interest rate of more than 15%.  In fact, in emails sent on October 17, 2018 to Kassab and Gindi, Washburn, on behalf of Plaintiffs, notified Defendants that Plaintiffs required that any transaction provide for interest rates for no more than "**15%**", a copy of which email exchange is attached as <u>Exhibit</u> 1.

30.     On October 18, 2018, Kassab, on behalf of Defendants, emailed to Washburn, on behalf of Plaintiffs: (A)(i) a Merchant Advance Agreement for the Purchase and Sale of Future Receipts; (ii) a Personal Guaranty of Performance for the benefit of Merchant Advance; and, (iii) Merchant Advance Affidavit of Confession of Judgment (collectively, the "**Initial Merchant Advance Agreements**"); and (B)(i) an Ace Funding Agreement for the Purchase and Sale of Future Receipts; (ii) Personal Guaranty of Performance for the benefit of Ace Funding; and, (iii) Ace Funding Confession of Judgment for the benefit of Ace Funding (collectively, the "**Initial Ace Agreements**" and together with the Initial Merchant Advance Agreements, the "**Initial Agreements**"), a copy of which is attached hereto as <u>Exhibit</u> 2.

31.     The Initial Agreements, as drafted by Defendants, provide for an interest rate of 50%.  Therefore, on October 18, 2018, Plaintiffs notified Defendants, by email from Washburn to Kassab, that the Initial Agreements were defective because among other things, the Initial

Agreements provide a usurious interest rate of 50% rather than the 15% interest rate that was required by Plaintiffs and agreed to by Defendants, a copy of which email is attached hereto as Exhibit 3.

32.     Without regard to Plaintiffs objection to the interest terms in the Initial Agreements, later in the day on October 18, 2018 Defendants provided Plaintiffs, by email from Kassab to Washburn: (i) a Green Note Capital Merchant Agreement; (ii) Security Agreement and Guaranty for the benefit of Green Note; and, (iii) Affidavit of Confession of Judgment for the benefit of Green Note (collectively, the "**Initial Green Note Agreements**"), a copy of which is attached hereto as Exhibit 4.   Defendants inexplicably replaced the "Merchant Advance" agreements with the Initial Green Note Agreements.

33.     The Initial Green Note Agreements provide for an incorrect weekly payment amount, thereby wrongfully increasing Zyppah's weekly payments and proposing a usurious interest rate of 49.9%, with the entire balance and "interest" to be repaid over 28 weeks.

34.     Later in the day on October 18, 2018, Defendants sent Plaintiffs, by email from Kassab to Washburn, a revised: (i) Ace Funding Agreement for the Purchase and Sale of Future Receipts; (ii) Personal Guaranty of Performance; and, (iii) Affidavit of Confession of Judgment (collectively, the "**Revised Ace Agreements**"), a copy of which is attached as Exhibit 5.   The revised agreement changed the amount "loaned" by Ace Funding but did not materially change the "interest rate."

35.     On October 18, 2018, Defendants provided Plaintiffs, by email from Gindi to Washburn, a proposed United Secured Letter of Guarantee ("**Draft United Secured Letter of Guaranty**"), along with an "ACH Debit Authorization Form" to authorize United Secured (to debit Zyppah's bank account, a copy of which is attached as Exhibit 6.   Despite that all communications from Defendants up to this point had been made by persons doing business

9

from email addresses associated with United Secured, this is the first document Defendants provided from United Secured rather than their various other entities.

36.     Therefore, also on October 18, 2018, Plaintiffs notified Defendants, by email from Washburn to Kassab and Gindi, that the Revised ACE Agreements and Initial Green Note Agreements require revisions to, among other things, provide for the 15% interest rate promised to Plaintiffs so that the parties "won't need to issue the so-called 'guarantee letter[s]'" in order to give Plaintiffs the interest rate of 15% that was promised, a copy of which email is attached hereto as <u>Exhibit</u> 7.  Defendants refused to comply with Washburn's request.

37.     On October 22, 2018, Plaintiffs provided Defendants, by email from Washburn to Kassab and Gindi, a copy of the revised and executed:

(A) Green Note Merchant Agreement, Green Note Security Agreement and Guaranty; and Green Note Affidavit of Confession of Judgment (collectively referred to as the "**<u>Green Note Documents</u>**"); and

(B) United Secured Letter of Guarantee ("**<u>United Secured Letter of Guarantee</u>**"), Ace Funding Agreement for the Purchase and Sale of Future Receipts, Personal Guaranty of Performance for the benefit of Ace Funding, and Ace Funding Confession of Judgment (collectively, the "**<u>Final United Ace Documents</u>**"), copies of the documents referred to in (A) and (B) herein are attached collectively as <u>Exhibit</u> 8.

38.     The United Secured Letter of Guarantee and Ace Funding Agreement for the Purchase and Sale of Future Receipts, copies of which are attached as <u>Exhibit</u> 8 share the same trademark or business emblem on the top of each document.

39.     On October 30, 2018, Defendants provided Plaintiffs, by email from Gindi to Washburn, a "new agreement" and an "updated letter [of guarantee]" corresponding to the Green Note Documents; on the same day, Washburn advised Gindi in writing that the "so-called 'new'

agreement contained unacceptable terms, including a loan amount greater than what was sought and a usurious interest rate of 40%, which is more than the 15% interest that was agreed upon. The communications referenced in this Paragraph are attached hereto as <u>Exhibits</u> 9 and 10.

40.     Finally on the evening of October 30, 2018, Plaintiffs returned to Defendants by email an executed version of the Green Note Letter of Guarantee (the "**<u>Green Note Letter of Guarantee</u>**"), along with another executed version of the Green Note Documents, each with agreed upon revisions (together with the Green Note Letter of Guarantee, collectively referred to as the "**Final <u>Green Note Documents</u>**"), copies of which are attached as Exhibit 11.  For purposes herein, the Green Note Letter of Guarantee and United Secured Letter of Guarantee may collectively be referred to herein as the "**<u>Letters of Guarantee</u>**."

41.     Pursuant to the merchant cash advance transactions, Plaintiffs "loaned" a combined $750,000 from Ace Funding and Green Note in exchange for giving Ace Funding and Green Note rights to debit $1,094,550 in weekly payments from Plaintiffs' account over approximately 7.5 months; however, the Letters of Guarantee reduce the amount Defendants were permitted to debit from Plaintiffs' accounts to $862,500 provided that the first five payments under the Ace Funding transaction and first ten payments under the Green Note transaction were timely debited.  These timely debits occurred and Plaintiffs therefore satisfied the terms of the Letters of Guarantee.

42.     Despite repeated requests from Plaintiffs, Defendants failed to provide an executed copy of *any* of the agreements underlying the parties' transactions.  On October 30, 2018, and again on November 2, 2018, Plaintiff requested from Defendants, by email from Washburn to Gindi, a countersigned copy of the United Secured Letter of Guarantee and agreements.  Gindi responded, with a copy to Kassab, that he will "make sure we get that from our CEO and send it over …," a copy of which writing is attached as <u>Exhibit</u> 12.  Despite

Plaintiffs' repeated requests and Defendants' representation in writing that the countersigned versions would be sent, Plaintiffs have yet to receive a countersigned version of the Green Note Documents and United Ace Documents.

      ***B.***     ***The Improper Debits, Excessive Fees and Usurious Terms of the Green Note and United Letter of Guarantees***

43.     Even though ¶ 4 of the Ace Funding "Agreement for the Purchase and Sale of Future Receipts" asserts that "This is Not a Loan" and ¶ 1.9 of the Green Note "Purchase and Sale of Future Receivables" agreement states that the agreement shall "not be construed as a loan," the United Secured Letter of Guarantee explicitly refers to the Ace Funding "**Pending Loan**."  The United Secured Letter of Guarantee further provides for a "discount of $157,050.00 off the **interest**, reducing the total payback due to [United Secured] to $517,500.00 which will be a 15% rate.  Accordingly, the weekly payments after the first 5 weeks, (the remaining 27 weeks) will be reduced to $15,263.15."  (Emphasis supplied).  The United Secured Letter of Guarantee further represents that United Secured has been in the industry for 20 years.

44.     The Green Note Letter of Guarantee similarly refers to the Green Note "**Pending Loan**" and provides that Green Note "will discount $75,000 off the **interest** bringing the payback to $345,000.00, which will be a 15% rate.  Accordingly, the weekly payments after the first 10 weeks, (the remaining 26 weeks) will be reduced to $8,221.15."  (Emphasis supplied). The Green Note Letter of Guarantee further represents that Green Note has been in the industry for over 12 years.

45.     The rates of interest provided for in the Green Note Merchant Agreement and the Ace Funding Agreement for the Purchase and Sale of Future Receipts are 40% and 50%, respectively, for repayment terms well under one year.  Without the application of the discount provided for in the United Secured Letter of Guarantee and Green Note Letter of Guarantee, the Final Green Note Documents and Final United Ace Documents each contain an illegal usurious

rate under applicable law and, are therefore, void.  Specifically, because Defendants did not apply the promised "discounts," Defendants induced Plaintiffs to pay a total of $1,107,675 to satisfy a "loan" of only $750,000, a profit of more than $350,000 to Defendants in the less than three-month period between Defendants' funding of the transaction and Plaintiffs' remittance of the final payment (which was wrongfully inflated by Defendants as described below).

46.     Additionally, Defendants demanded excessive fees in the amount of $33,750 for payment of an "up front ACH fee." Defendants did not denominate the portion of this fee that was attributable to the Final United Ace Documents or Final Green Note Documents and instead withheld this fee – in addition to an unauthorized and unexplained fee of $5,000 that they later refunded –  from the funding payment made by Ace Funding.

### C.     *Defendants' Improper Debits Under the Green Note and United Letters of Guarantee*

47.     At all relevant times, Plaintiffs qualified to receive the discount of $157,050 and the reduction of weekly payments to $15,263.15 after the first five weeks of payments under the United Secured Letter of Guarantee, but Defendants *always* deducted the undiscounted, higher, amount.  Similarly, at all relevant times, Plaintiffs qualified to receive the discount of $75,000 and the reduction in weekly payments after the first 10 weeks to $8,221.15 under the Green Note Letter of Guarantee, but Defendants *always* deducted the undiscounted, higher, amount.

48.     In weekly debits from November 30, 2018 through January 4, 2019 Ace Funding improperly debited Zyppah's account in the amount of $21,079.00 weekly, when in fact it should have debited $15,263.15 in accordance with terms of the United Secured Letter of Guarantee. Ace Funding continued this illicit behavior despite written notification by Plaintiffs on December 5, 2018 that "United Secured Capital/Ace" was withdrawing more than permitted, a copy of which communication is attached as Exhibit 13.

49.    On January 4, 2019, Green Note improperly debited Zyppah's account in the amount of $13,125 when in fact it should have debited $8,221.15 in accordance with the terms of the Green Note Letter of Guarantee.

50.    As of the date hereof, and despite repeated demands by Plaintiffs, Defendants have failed to return the funds they improperly debited from Zyppah's account.

**D.    Defendants' Conversion of the Overpayment and Fraudulent Promises of Reimbursement**

51.    On January 3, 2019, Plaintiffs notified Defendants, by email from Washburn to Gindi, that Zyppah was in the process of closing on a line of credit with a lender that required Zyppah to "pay off all other outstanding loans, including the two subject ones we have with you."   In that connection, Washburn asked Gindi to confirm payoff amounts calculated by Washburn that reflected total payoff amounts for each "loan" consistent with the "discount" terms of the Letters of Guarantee.   Washburn repeatedly informed Defendants that this was a time-sensitive request and that Plaintiffs were under significant time pressure to pay off all outstanding "loans" pursuant to requirements of its new lender. A copy of this email exchange is attached hereto as <u>Exhibit</u> 14.

52.    On January 3, 2019, Defendants provided Plaintiffs with two payoff letters by an email from Gindi to Washburn along with wiring instructions; a copy of this email is attached as <u>Exhibit</u> 15.

53.    Later on January 3, 2019 and January 4, 2019, Plaintiffs advised Defendants, by emails from Washburn to Gindi, that the payoff letters were inaccurate and overcharged Plaintiffs in the amount of $279,372.20, copies of which emails are attached as <u>Exhibit</u> 16. Defendants subsequently refunded only $34,204.68 to Zyppah's account in connection with two erroneous debits, but they have failed to honor their promise to refund Zyppah the remaining $245,175 (the "**Overpayment**").

14

54.     On January 4, 2019, Defendants provided Plaintiffs, by email from Gindi to Washburn, with a "new payoff letter," a copy of which is attached as <u>Exhibit</u> 17.  The "revised" payoff amounts were unchanged and demanded a knowingly inflated payoff amount.  The last payoff letters Plaintiffs received from Defendants (the "**Payoff Letters**") are attached hereto as Exhibit 18.

55.     The Ace Funding Payoff Letter demanded payment in the amount of $463,753.20.  The Green Note Payoff Letter demanded payment in the amount of $315,000.  Each letter represented that a Defendant held a lien on Plaintiffs' assets by means of a "UCC-1 filing statement" and that each lien would not be released unless Plaintiffs remitted the entirety of each payment Defendants demanded.

56.     Gindi and Kassab had direct knowledge that Plaintiffs feared that they would not be able to execute on their new financing if Defendants would not release their fictitious liens. (see ¶ 50.)  On January 4, 2019, Gindi, on behalf of Defendants, induced Plaintiffs, in writing, a copy of which is attached hereto as <u>Exhibit</u> 19, to pay to Defendants the Overpayment in order for Plaintiffs to close on their time-sensitive new loan.  Gindi accomplished this by representing that after that closing, Defendants would reimburse Zyppah for the amount of the Overpayment.  Defendants expressly informed Zyppah: "*The amount to be sent back to zyp[p]ah is $279,372.20.*"  Again, on January 11, 2019, Gindi, on behalf of Defendants, "confirmed" that Plaintiffs would receive "reimbursement" for the Overpayment, a copy of which is attached hereto as <u>Exhibit</u> 20.

57.     Given the urgency of closing with the new lender and Plaintiffs' belief based upon Defendants' misrepresentation that Defendants held UCC-1 liens that needed to be released as a condition to closing on the new financing, Zyppah proceeded with its new lending and caused the $778,753.20 in funds that Defendants demanded in the Payoff Letters to be

transferred to Defendants, resulting in Defendants' receipt of the Overpayment.  Plaintiffs took this action in reliance on Defendants' acknowledgment and promise that Defendants would promptly reimburse the Overpayment.

58.     In response to Plaintiffs' demand, on January 11, 2019 Defendant Gindi informed Washburn that "[t]he reversal was just initiated so you will see funds at some point today or Monday" and that Washburn should "[r]est assured it was already taken care of and you won't have to worry."  When Washburn asked about the amount of the reversal, Gindi replied that Defendants were only reversing a single payment Green Note improperly withdrew in the amount of $13,125 and that "[t]he larger amount is going to take a little bit longer than expected but will get done."  *See* Exhibit 20.

59.     Following Defendants' failure to reimburse Plaintiffs for the Overpayment, Washburn notified Defendants in writing on January 11, 2019, that any further delay in rendering reimbursement for the Overpayment would damage Plaintiffs and that Plaintiffs would seek interest on the amounts overdue.

60.      In response, on or about January 17, 2019, Washburn was contacted over the telephone by Defendant, Campbell, who represented himself as the director of accounting for United Secured with the requisite power to reimburse Plaintiffs for the Overpayment and advised that the reimbursement for the Overpayment would be rendered soon.

61.     Despite due demands, Defendants failed or refused to reimburse Plaintiffs for the Overpayment, and Plaintiffs commenced this suit.  On March 19, 2019, Defendants, United Secured and Green Note appeared through counsel and filed a pre-motion letter attached hereto as Exhibit 21, in which they admitted that the United Secured Letter of Guarantee and Green Note Letter of Guarantee were fraudulent, bearing fictitious names for "executives" of the Defendants [Dkt. No. 20].

## THE FRAUD

**A.**     ***The Fraudulent Enterprise***

62.     The Entity Defendants, by and through the Principal Perpetrators, acted in concert to defraud Plaintiffs, converting more than $245,000 from Plaintiffs and obtaining an additional $112,500 in "interest" and $33,750 in fees through a scheme Defendants appear to have also perpetrated on numerous other unwitting customers.

63.     From the inception and at all relevant times thereafter, the Principal Perpetrators acted for and made misrepresentations on behalf of the Entity Defendants without regard for corporate formalities or separateness, to induce Plaintiffs to enter the merchant cash advance agreements and to defraud and convert funds from Plaintiffs.  For example:

(A)     All emails from Gindi and Kassab were from their "unitedsecuredcapital.com" email addresses, yet the agreements they emailed to and asked Zyppah to execute were for advances purportedly from Merchant Advance, and thereafter Ace Funding and Green Note, even though no officer or representative of those entities was contemporaneously represented by Defendants to have any relationship to the transaction (see Exhibits 2, 4, 6, 7 attached hereto);

(B)     Without explanation, on October 18, 2018, Kassab emailed Zyppah the first proposed merchant cash advance agreement on behalf of "Merchant Advance" – an entity completely previously unknown to Plaintiffs, with terms that did not comport with Plaintiffs' understanding of the anticipated transaction (see Exhibit 2 attached hereto);

(C)     Although agreements for advances were thereafter executed by Plaintiffs with Ace Funding and Green Note, in order to induce Plaintiffs into believing that the agreements would comply with Plaintiffs' requirement of not more than 15%

interest, Gindi and Kassab delivered the "United Secured Letter of Guarantee," which required United Secured (not Ace Funding or Green Note, with whom Plaintiffs had the merchant cash advance agreements) to provide a "discount of $157,050.00 off of interest, reducing the total payback due U.S.C. [i.e., United Secured]," even though there was *no payback due* to United Secured because it had not made any advances and was not a party to any other agreement with Plaintiffs. Moreover, the United Secured Letter of Guarantee expressly references a non-existent "above U.S.C. funded loan" in the amount of $450,000 – the precise amount of the "loan" from Ace Funding.  (See Exhibits 7, 8 attached hereto).

(D)  Although Plaintiffs only had merchant cash advance agreements with Ace Funding and Green Note, on October 18, 2018 (the same day Defendants delivered the proposed Merchant Advance and initial/incorrect Ace Funding agreements), Gindi asked Zyppah to execute and return the "ACH Debit Authorization Form" to grant United Secured (*not* Ace Funding or Green Note) the authority to debit Zyppah's bank account for payments purportedly due under the merchant cash advance agreements (a right Defendants flagrantly abused, as more particularly described herein) (see Exhibit 6 attached hereto).

(E)  None of the "merchant cash advance agreements" or the Entity Defendants' websites disclose the Entity Defendants' physical, business or mailing addresses – even the United Secured "ACH Debit Authorization Agreement" does not disclose an address (see Exhibit 6 attached hereto).

(F)  United Secured's and Green Note's addresses (discovered through "Better Business Bureau" and other internet searches) are mere "drop boxes."  In fact, Green Note's

"place of business" represented on the Better Business Bureau website is apparently a mailbox "Federal Express" store in Brooklyn:



(G) United Secured's address (according to the New York Secretary of State) appears to be a pizza parlor in Brooklyn:



(H) Ace Funding's mailing address as represented in publicly available documents appears to be a fitness center in Miami, Florida:



(I)   All relevant documents, including the merchant cash advance agreement and Letters of Guarantee were drafted, prepared and delivered by Defendants.  In fact, Kassab emailed Zyppah the Ace Funding and Green Note agreements, and Gindi emailed Zyppah the Letters of Guarantee (see <u>Exhibits 2, 4, 6, 7, 9</u> attached hereto).

(J)   When Plaintiffs would not agree to the approximately 50% interest rate Defendants demanded in "negotiations," Defendants responded by promising to reduce the interest rate through discounts in the Letters of Guarantee.  Defendants ignored or rejected requests from Washburn that (i) the entire loan amount be from one entity, and (ii) that the merchant cash advance agreements themselves reflect the 15% interest rate as the maximum Plaintiffs were willing to pay so that the Letters of Guarantee would be unnecessary.  Instead, Defendants insisted on a complicated transaction structure involving multiple entities and documents, and would include the "discounts" only in documents the Defendants now assert are false and *void ab initio*.

(K)   The Letters of Guarantee were delivered in order to induce Plaintiffs to agree to the transaction (to provide Plaintiffs comfort that "the interest" would be "reduce[d]" to

[15%]), by stating that "[t]his is our guarantee our word is what we stand by here. We have been in the industry for over **20 years** our mission is and always has been to keep our clients happy" (see Exhibit 6 attached hereto).   However, United Secured's own website states that it has been in business since **2010** (only **nine years** in business), and the New York Secretary of State's records indicate that United Secured was not incorporated until **2017** (just one year before the transaction with Plaintiffs) (see Exhibit 22 attached hereto).  Ace Funding was not incorporated until November 8, 2015, just **three years** before the transaction with Plaintiffs (see Exhibit 23 attached hereto).

(L)   Green Note's Letter of Guarantee was given to Plaintiffs for the same fraudulent purpose – to induce Plaintiffs to agree to the transaction.  The Green Note Letter of Guarantee also states that "[t]his is our guarantee our word is what we stand by here. We have been in the industry for over **12 years** our mission is and always has been to keep our clients happy" (see Exhibits 9, 11 attached hereto).  However, Green Note's own website states that it has been in business since 2010, just **nine years**, and the Delaware Secretary of State's records reflect that Green Note was incorporated on January 2, 2018, fewer than **eleven months** before it entered into the agreements with Plaintiffs (see Exhibit 24 attached hereto).

(M)  Although United Secured was not actually formed until May 19, 2017, its website represents that it has made more than $50,000,000 in direct loans and is licensed to operate in all 50 states – despite the fact that its *undisclosed* place of business is a pizza shop in Brooklyn, and on the same webpage, it misrepresents the number of years it has been in business (see Exhibit 22 attached hereto).  Green Note's webpage similarly states that it has been licensed to operate in all 50 states while

grossly exaggerating the number of years it has been in business (representing that it was incorporated in 2008 and that "since 2010" it has been a "leader in the small-medium sized business marketplace") even though it was not incorporated until **January 2, 2018,** mere months before its transaction with Plaintiffs.

(N) United Secured and Green Note, by and through their attorney, have in fact admitted that the Letters of Guarantee are **fraudulent** by expressly representing in writing on March 19, 2019 to this Court that "both United [Secured] and Green Note **deny the validity of the Letters of Guarantee**, which are unsigned and name as signatories and C.E.O. of those entities **persons who have never worked for United [Secured] or Green Note**." (see Defendants' letter to the Court, dated March 19, 2019 [Dkt. No. 20], attached hereto as Exhibit 21 (emphasis added)).  However, as stated above, the Letters of Guarantee were expressly delivered by Gindi by email twice on October 18, 2018 (see Exhibit 6 attached hereto), and twice again on October 30, 2018 (see Exhibit 9 attached hereto); in the October 30 communication, Gindi not only delivered and acknowledged the letters – he represented that the Letters of Guarantee would be executed by the C.E.O. (see Exhibit 12 attached hereto).  If counsel to the Defendants is correct (i.e. that the documents irrefutably sent by Gindi were fraudulent), then plainly Defendants sought to and actually charged and collected from Defendants usurious interest and charges totaling $391,425 in a span of fewer than three months.

(O) Both the Ace Funding and Green Note merchant cash advance agreements were prepared, delivered and emailed by Kassab to Plaintiffs, yet **both** agreements (each drafted by Defendants) separately provide that Plaintiffs would sell Green Note "all of [Plaintiffs'] … Receipts…" – and simultaneously sell 12% of the same "Receipts"

to Ace Funding - a legal and factual impossibility unless the entities were one in the same.

(P) Plaintiffs relied on Defendants' representations in the Letters of Guarantee and in the emails and written promises made by Gindi and Kassab in connection therewith, to their detriment.

(Q) Defendants knew that Plaintiffs relied on the Letters of Guarantee and Defendants' express promises and representations therein when agreeing to enter into the transaction.

(R) If not for the Defendants misrepresentations, Plaintiffs would not have entered into any "agreements" with Defendants and would not have granted Defendants access to Zyppah's account, a fact Washburn repeatedly made clear in email communications stating that Plaintiffs would agree to an interest rate of no more than 15%.

(S) On January 4, 2019, Defendants fraudulently induced Plaintiffs into making the Overpayment by (i) misrepresenting that Ace Funding and Green Note held UCC-1 financing liens on Plaintiffs' property when they did not, and (ii) refusing to release their supposed security interests on Plaintiffs' assets unless the Overpayment was made, while (iii) simultaneously promising that they would "refund" the Overpayment immediately after they received it (see Exhibits 17-21, attached hereto). Defendants were **not** entitled to the Overpayment and they lied when they promised to return it to Plaintiffs in order to induce Plaintiff to make the Overpayment.

(T) Notwithstanding repeated demands, Defendants have not honored the Letters of Guarantee, or returned the Overpayment, despite Gindi's repeated written representations and false assurances (see, e.g., Exhibits 19, 20 attached hereto). In

fact, on January 11, 2019, Gindi advised Plaintiffs that "[t]he reversal was just initiated so you will see funds at some point today or Monday depending on whether it went out as a wire or an ACH. **Rest assured it was already taken care of and you won't have to worry**." See Exhibit 20 attached hereto.  Later that same day, Gindi "confirmed" that the Overpayment (then believed to be in the amount of $279,372.20) was being returned (see Exhibit 20 attached hereto).  The Overpayment has **not** been returned.

### B.    Pattern and Practice

64.    Defendants' conduct represents a pattern and practice of fraud and deceit by: (a) operating with websites containing apparent material misrepresentations and omissions; (b) ignoring corporate formalities and separateness; (c) purporting to operate commercial lending businesses out of fictitious addresses (Federal Express and pizza shops); (d) misrepresenting the years in business in the Letters of Guarantee to induce Plaintiffs to transact business with them; (e) charging Plaintiffs and other customers excessive fees and costs and usurious interest rates; and, (f) wrongfully debiting their customers' accounts and retaining funds (the Overpayment) to which they are not entitled.

65.    Since at least 2016, other merchants have filed actions against Defendants, Ace Funding and alleged affiliates, including against Guttman himself, asserting a substantially similar pattern and practice as described above.  These actions include, but are not limited to, claims of fraud, usurious lending, state law RICO claims.  Ace Funding is the common alleged culprit found in each of these cases:

　　　　　　a.    *Dual Diagnosis Treatment Center, Inc., et al., v. Ace Funding Source, LLC, et al.,* Index No. 504427/2019, in the Supreme Court of the State of New York, County of Kings. The Verified Complaint is attached hereto as Exhibit 25, and was filed on February 28, 2019 against Guttman, Ace Funding and their affiliates alleging that Defendants are engaged in a

"fraudulent lending scheme" and asserting claims for RICO violations and abuse of process.

b. *Mir Joffrey, et al., v. Merchant Advance Inc., et al.,* Index No. 650965/2019, in the Supreme Court of the State of New York, County of New York. Attached hereto as <u>Exhibit</u> 26 is Memorandum of Law in Support of Order to Show Cause for a Preliminary Injunction and Temporary Restraining Order filed against Ace Funding and its affiliates on February 15, 2019, alleging that Defendants are engaged in a "predatory lending scheme" and that Defendants wrongfully removed funds from the plaintiffs' bank accounts resulting in the demise of plaintiffs' business.

c. *Ikechukwu Okorie, M.D., et al, v. Ace Funding Source, LLC, et al.,* Case No. 2:17-cv-2-KS-MTP, in the United States District Court for the District of Mississippi.  Attached hereto as <u>Exhibit</u> 27 is the Verified Complaint for Temporary Restraining Order and Preliminary Injunction filed against Ace Funding, Guttman and their affiliates on January 6, 2017, alleging that Defendants' purported merchant advance agreements are usurious loans and that their scheme violates the Mississippi state law RICO Act.

d. *JZRM Corporation, et al., v. Ace Funding Source, LLC, et al.,* Index No. 031397/2017, in the Supreme Court of the State of New York, County of Rockland. Attached hereto as <u>Exhibit</u> 28 is the Verified Complaint filed against Ace Funding and its affiliates on March 28, 2017, alleging that Defendants' purported merchant advance agreements are criminally usurious loans through which Defendants effectively sought to collect an interest rate of 149% and that Defendants made material misrepresentations in connection with the transactions.

e. *Meridian Technology Solutions, Inc., et al., v. Trenen Capital Inc., et al.,* Index No. 157627/2017, in the Supreme Court of the State of New York, County of New York.  Attached hereto as <u>Exhibit</u> 29 is the Complaint filed against Ace Funding and its affiliates on August 25, 2017, alleging that Defendants' purported merchant advance agreements are criminally usurious loans through which Defendants effectively sought to collect an annualized interest rate as high as 281% and that Defendants made material misrepresentations in connection with the transactions.

f. Additional lawsuits were filed by Defendants' "customers" that were either settled or dismissed, making similar allegations.

66.    Based on the above referenced complaints alone, Ace Funding and Guttman appear to operate through a number of "entities" through which they are alleged to have defrauded their customers.  These entities include at least:

- Ace Funding

- Ace Funding Group, LLC
- United Secured
- Green Note
- Merchant Advance
- Merchant Funding Services, LLC
- Merchant Advance Inc.
- BizFund, LLC
- Fast Business Financial, LLC
- Dash Funding Source, LLC
- Biz Advance Now, Inc.
- Ram Capital Funding, LLC
- ML Factors, LLC
- Small Business Capital Services
- Trenen Capital Inc.
- Capital Merchant Services, LLC
- Capcall, LLC
- Richmond Capital Group, LLC
- Cash Village NY, LLC
- Empire Business Funding Inc.
- Express Funding, Inc.
- Express Funding of America, LLC
- Express Funding I, LLC

67.     At least two of the entities listed in the preceding Paragraph have represented in public filings that they are located at 2371 McDonald Avenue, Brooklyn, New York – an address that appears to be located in the same warehouse that Defendants Gindi and Kassab represent is the address of United Secured in their email signature boxes:



68.     Defendants' conduct directly affects interstate commerce. Plaintiffs, who are retail merchants selling directly to consumers, are located in California and Nevada, and several of the parties in the above referenced litigations are in Mississippi, Missouri and elsewhere.

69.     Defendants' conduct violates 18 U.S.C. § 1962(a) - (d) by collecting an unlawful debt (as defined by 18 U.S.C. § 1961(6)), through fraud and deceit, and by charging usurious "interest" in violation of New York General Obligation Law § 5-501(1) and New York Penal Law § 190.40 by charging and collecting "interest" greater than 25%, and by conspiring to commit such acts of fraud and usury against Plaintiffs and the public at large.

70.     Absent judicial intervention and the appointment of an independent fiduciary, such as a receiver, Plaintiffs do not believe Defendants will cease their fraudulent conduct or repay the funds Defendants have improperly (and illegally) taken and withheld.  Nor can Plaintiffs be certain that Defendants have the capacity to return Plaintiffs wrongfully withheld funds because, based on the sheer number of entities through which Defendants appear to conduct "business," Defendants may be engaged in a "Ponzi scheme" in which they relend the funds obtained from merchants they have defrauded in one transaction to other unwitting merchant-victims in the next transaction (through a newly created entity as having been in business "for decades"), retaining ill-gotten profits to the detriment of Plaintiffs and the public at large.

**COUNT I**
**RICO Violations**
**(Against All Defendants)**

71.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 70 above as if fully set forth herein.

72.     Each Defendant, engaged in or is engaged in activities that affect interstate commerce, including financing transactions across state lines involving parties in multiple states.

73.     In furtherance of their fraudulent scheme, each Defendant utilized interstate mail, telephone communications, wire communications, email and other internet communications (i) to prepare and circulate to Plaintiffs and other merchants documents and other communications

containing knowingly and intentionally false, materially misleading and fraudulent statements in order to induce them to enter into merchant cash advance transactions and to remit money in excess of amounts actually owed or permitted by applicable law; (ii) to wrongfully remove money from the bank accounts of the Plaintiffs and other merchants in excess of amounts actually owed or permitted by applicable law; and, (iii) to wrongfully refuse to release security interests on the assets of Plaintiffs and other merchants in order to extort and coerce them to remit money in excess of amounts actually owed or permitted by applicable law.

74.    Defendants' wrongful actions injured Plaintiffs and other merchants who were the intended targets of Defendants' fraudulent predatory lending scheme, each of whom suffered direct, pecuniary harm.

75.    Defendants knowingly and intentionally engaged in criminal conduct, as described above, committing actions constituting predicate crimes under 18 U.S.C. § 1961, *et seq.* (the Racketeer Influenced and Corrupt Organizations "RICO" Act).

76.    Defendants extorted and coerced Plaintiffs to remit the Overpayment through knowing and intentional misrepresentations; specifically, by falsely stating that they held security interests in Plaintiffs' assets and telling Plaintiffs they would not extinguish the supposed security interests unless Plaintiffs remitted the improperly demanded Overpayment all the while representing that if Plaintiffs – who believed they needed to *immediately* extinguish Defendants' "liens" or risk losing financing from a third party –  made the Overpayment the Defendants would immediately refund it.  The Overpayment was in excess to amounts owed (if any) or permitted by applicable law.  Defendants actions constitute criminal conduct in the nature of collection of extensions of credit by extortionate means in violation of 18 U.S.C. § 894.

77.    Defendants made knowing and intentional misrepresentations to Plaintiffs to induce them to enter into merchant cash advance transactions; specifically, Defendants (i)

misrepresented Ace Funding, United Secured, and Green Note's business history, including the number of years they had done business, the amount of "loans" they had provided to customers, and that they had dealings in all 50 states; (ii) misrepresented in the Letters of Guarantee from Green Note and United Secured that they would "discount" the overall "interest" due to 15% of the combined $750,000 Plaintiffs "loaned" from Defendants provided that Plaintiffs' initial payments were timely.  These misrepresentations, together with the misrepresentations identified in the preceding Paragraph, were communicated over the telephone and internet using email and interstate mail.  These actions constitute wire fraud and mail fraud in violation of 18 U.S.C. §§ 1343 and 1341, respectively.

78.     Defendants' actions constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961.

79.     Upon information and belief, the proceeds of Defendants' wrongful and unlawful conduct may have been invested or used by Defendants to further their ongoing fraudulent scheme in violation of 18 U.S.C. § 1962(a).

80.     Defendants' actions constitute furtherance of a criminal enterprise through a pattern of racketeering activity and collection of unlawful debts in violation of 18 U.S.C. § 1962.

81.     The Entity Defendants and Principal Perpetrators have acted in concert and conspired to violate 18 U.S.C. § 1962.

82.     Plaintiffs have been injured in their business and property by Defendants' violations of 18 U.S.C. § 1962; and pursuant to 18 U.S.C. § 1964, are entitled to recover actual damages in an amount to be determined by the Court, plus treble damages pursuant to 18 U.S.C. § 1964(c), and costs and attorneys' fees in amounts to be determined by the Court.

## COUNT II
### Fraud
### (Against All Defendants)

83.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 82 above as if fully set forth herein.

84.     Defendants made material misrepresentations to Plaintiffs to induce them to enter into merchant cash advance transactions; specifically, Defendants (i) misrepresented Ace Funding, United Secured, and/or Green Note's business history, including the number of years they had been engaged in business, and the identity of their (or that they even had) Chief Executive Officers and (ii) misrepresented in the Letters of Guarantee from Green Note and United Secured that they would "discount" the overall "interest" due to 15% of the combined $750,000 Plaintiffs "loaned" from Defendants provided that Plaintiffs' initial payments were timely.

85.     Defendants also made material misrepresentations to Plaintiffs to induce them into remitting the Overpayment; specifically, by falsely stating that they held security interests in Plaintiffs' assets and telling Plaintiffs they would not extinguish the supposed security interests unless Plaintiffs remitted the improperly demanded Overpayment all the while representing that if Plaintiffs – who believed they needed to *immediately* extinguish Defendants' "liens" or risk losing financing from a third party –  made the Overpayment the Defendants would immediately refund it.

86.     At all times, Defendants' misrepresentations were knowingly false.  Specifically, the Principal Perpetrators, on behalf of the Entity Defendants, knew that the information they provided concerning the history of the Entity Defendants was false and they knew that the Letters of Guarantee bore the names of fictitious executives.  Moreover, Defendants knew that the "discounts" they offered were false and that their promises to return the Overpayment were

false as reflected in United Secured and Green Note's representation to this Court that the Letters of Guarantee – which Defendants drafted and which served as the basis for the "discounts" and the eventual Overpayment – were false.

87.   Defendants never honored the "discounts" that they promised in the Letters of Guarantee – which Defendants drafted and transmitted to Plaintiffs.  These false "discounts" and other misrepresentations were intended to induce Plaintiffs to enter into the merchant cash advance transactions with Ace Funding and Green Note, and Plaintiffs in fact were so induced based upon their reasonable reliance on Defendants' misrepresentations.

88.   Plaintiffs' reliance on Defendants' misrepresentations was reasonable and justifiable.

89.   Defendants' actions and the fraudulent scheme described above has damaged Plaintiffs at least in the amount of (i) the Overpayment, (ii) the excessive fees paid to Defendants, and (iii) the "finance charges" paid to Defendants.  Plaintiffs have also suffered lost profits and have incurred substantial costs and attorneys' fees.

90.   Based upon the willful, malicious, dishonest, and criminal nature of Defendants' conduct, and to deter Defendants and others from engaging in similar misconduct in the future, Plaintiffs are entitled to an award of punitive damages.

## COUNT III
### Fraudulent Inducement
### (Against All Defendants)

91.   Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 90 above as if fully set forth herein.

92.   Defendants made material misrepresentations to Plaintiffs to induce them to enter into merchant cash advance transactions; specifically, Defendants (i) misrepresented Ace Funding, United Secured, and/or Green Note's business history, including the number of years

they had done business and the identity of their (or that they even had) Chief Executive Officers and (ii) misrepresented in the Letters of Guarantee from Green Note and United Secured that they would "discount" the overall "interest" due to 15% of the combined $750,000 Plaintiffs "loaned" from Defendants provided that Plaintiffs' initial payments were timely.

93.     Defendants also made material misrepresentations to Plaintiffs to induce them into remitting the Overpayment; specifically, by falsely stating that they held security interests in Plaintiffs' assets and telling Plaintiffs they would not extinguish the supposed security interests unless Plaintiffs remitted the improperly demanded Overpayment all the while representing that if Plaintiffs – who believed they needed to *immediately* extinguish Defendants' "liens" or risk losing financing from a third party –  made the Overpayment the Defendants would immediately refund it.

94.     At all times, Defendants' misrepresentations were knowingly false.  Specifically, the Principal Perpetrators, on behalf of the Entity Defendants knew that the information they provided concerning the history on the Entity Defendants was false and they knew that the Letters of Guarantee bore the names of fictitious executives.  Moreover, Defendants knew that the "discounts" they offered were false and that their promises to return the Overpayment were false as reflected in United Secured and Green Note's representation to this Court that the Letters of Guarantee – which Defendants drafted and which served as the basis for the "discounts" and the eventual Overpayment – were false.

95.     Defendants' misrepresentations were intended to and did deceive Plaintiffs into believing they would receive the "discounts" and reimbursement of the Overpayment in order to induce them to enter into the merchant cash advance transactions and to remit the Overpayment, respectively.

96.     Plaintiffs' reliance on Defendants' misrepresentations was reasonable and justifiable.

97.     Defendants' actions and the fraudulent scheme described above has damaged Plaintiffs at least in the amount of (i) the Overpayment, (ii) the excessive fees paid to Defendants, and (iii) the "finance charges" paid to Defendants.  Plaintiffs have also suffered lost profits and have incurred substantial costs and attorneys' fees.

98.     Based upon the willful, malicious, dishonest, and criminal nature of Defendants' conduct, and to deter Defendants and others from engaging in similar misconduct in the future, Plaintiffs are entitled to an award of punitive damages.

**COUNT IV**
**Appointment of Receiver**

99.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 98 above as if fully set forth herein.

100.     The Entity Defendants and their assets are being used in a fraudulent and illicit manner to perpetrate Defendants' ongoing fraudulent scheme. This, combined with Defendants' demonstrated dishonesty, repeated fraudulent misrepresentations, and use of numerous entities known and unknown to Plaintiffs to facilitate their scheme, creates an immediate and substantial threat that a substantial portion of the funds Plaintiffs seek to recover – i.e. the Overpayment – will be removed, lost or otherwise improperly transferred to deny Plaintiffs their recovery, resulting in irreparable harm to Plaintiffs.

101.     The Overpayment is a specific fund remitted by Plaintiffs upon Defendants' promise that it would be separately held and returned promptly after Defendants received it.

102.     Defendants' demonstrated dishonesty and the likelihood that they will make further fraudulent misrepresentations would undermine the effectiveness of judicial oversight of the Entity Defendants.

103.    There are no less restrictive means available to prevent irreparable harm to the Plaintiffs given the nature and breadth of Defendants' ongoing fraudulent scheme.

104.    As a result of the foregoing, Plaintiffs are entitled to the immediate appointment of a receiver to secure, take custody of and control the assets of all Entity Defendants and the John Doe Companies Defendants pending the outcome of this litigation.

## COUNT V
### Conversion
### (Against All Defendants)

105.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 104 above as if fully set forth herein.

106.    At all relevant times, Plaintiffs, by Defendants' own admission, had and continue to have sole ownership over the Overpayment and the sole right to possess the Overpayment.

107.    Defendants conspired and acted in concert to wrongfully and unlawfully take the Overpayment through fraudulent misrepresentations.  Defendants continue to wrongfully and unlawfully withhold and exercise dominion and control over the Overpayment, and they have converted the Overpayment for Defendants' own use and benefit instead of its intended use.

108.    Defendants have refused or ignored all requests from Plaintiffs' to return the Overpayment.

109.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of the Overpayment plus additional damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

110.    Based upon the willful, malicious, dishonest, and criminal nature of Defendants' conduct, and to deter Defendants and others from engaging in similar misconduct in the future, Plaintiffs are entitled to an award of punitive damages.

## COUNT VI
### Civil Conspiracy
### (Against All Defendants)

111.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 105 above as if fully set forth herein.

112.    In furtherance of their fraudulent scheme, Defendants conspired and acted in concert to fraudulently misrepresent that Plaintiffs would receive the "discounts" contained in the Letters of Guarantee and to fraudulently misrepresent that the Entity Defendants would reimburse Plaintiffs for the Overpayment.  Defendants also conspired and acted in concert to wrongfully and unlawfully withhold, exercise dominion and control over, and convert the Overpayment.

113.    Defendants' actions were part of their common fraudulent scheme and were designed to deceive Plaintiffs in order to wrongfully and unlawfully induce Plaintiffs to enter into merchant cast advance transactions with Ace Funding and Green Note, resulting in the payment of excessive and improper fees and "finance charges," including inducing Plaintiffs to make the Overpayment which Defendants converted and continue to wrongfully and unlawfully retain.

114.    Defendants' actions and the fraudulent scheme described above have damaged Plaintiffs at least in the amount of (i) the Overpayment, (ii) the excessive fees paid to Defendants, and (iii) the "finance charges" paid to Defendants.  Plaintiffs have also suffered lost profits and have incurred substantial costs and attorneys' fees.

115.    Based upon the willful, malicious, dishonest, and criminal nature of Defendants' conduct, and to deter Defendants and others from engaging in similar misconduct in the future, Plaintiffs are entitled to an award of punitive damages.

### COUNT VII
**Alter Ego and Veil Piercing Liability**
**(Against Guttman, Mann, Gindi, Kassab and Campbell)**

116.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 106 above as if fully set forth herein.

117.    At all relevant times, the Principal Perpetrators owned and/or controlled Ace Funding, United Secured or Green Note.

118.    At all relevant times, the Principal Perpetrators dominated and controlled Ace Funding, United Secured and Green Note using each to perpetrate the fraud upon Plaintiffs.

119.    At all relevant times, Guttman, Mann, Kassab, Gindi or Campbell dominated and controlled the assets, operations, and activities of the Entity Defendants to defraud Plaintiffs.

120.    The Principal Perpetrators failed to observe important corporate formalities and used the assets and operations of the Entity Defendants for their own purpose and benefit to perpetrate the fraud against Plaintiffs.

121.    The Principal Perpetrators, acting in concert and in their capacities as officers and agents of the Entity Defendants, used United Secured email accounts to conduct business on behalf of Ace Funding and Green Note.

122.    Additionally, the Final Green Note Documents and the Final United Ace Documents – as Defendants themselves drafted – provide that Defendants simultaneously purported to have Ace Funding purchase "all" of Plaintiffs' future receivables and have Green Note also purchase 12% of those same receivables from Plaintiffs, effectively treating both entities as the same with no separate existence.

123.    The Principal Perpetrators dominate and control the Entity Defendants to such an extent that any adherence to the fiction of any of those entities' separate existence would permit the abuse of a limited liability or corporate entity and cause and promote injustice by allowing

36

Guttman, Mann, Kassab, Gindi and Campbell to evade liability or veil assets that should in equity be used to satisfy the judgment sought by the Plaintiffs in this litigation.

124.    At all relevant times, the Principal Perpetrators were and are alter egos of the Entity Defendants because there was and is such unity of interest, ownership and control that each Guttman, Mann, Kassab, Gindi and Campbell must be treated as one with the Entity Defendants to prevent the inequitable result of permitting them to profit from the fraud and conversion of funds from the Plaintiffs.

125.    Additionally or alternatively, any corporate veil between any of the Entity Defendants, on the one hand, and any of the Principal Perpetrators, on the other hand, must be pierced to hold the Principal Perpetrators vicariously liable for all obligations of the Entity Defendants owed to Plaintiffs.  Piercing the corporate veil is necessary and proper to prevent the wrongs and injustices perpetrated by the Defendants' fraudulent scheme because the Principal Perpetrators exercised domination and control over the Entity Defendants using them as instrumentalities to defraud and convert the Plaintiffs' money.

126.    As a result of the foregoing, Plaintiffs are entitled to a declaration that, based on their alter ego relationship, the Principal Perpetrators are each are liable for each of the Entity Defendants' obligations to the Plaintiffs.

### COUNT VIII
### Unjust Enrichment
### (Against All Defendants)

127.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 126 above as if fully set forth herein.

128.    Each Defendant was conferred a benefit and has and continues to be enriched by receipt of Plaintiffs' Overpayment, which Defendants, acting in concert, continue to withhold for

their own use and benefit using same for their personal benefit and in furtherance of their fraudulent scheme.

129.    At all relevant times, Plaintiffs maintained sole ownership and absolute right to possess the Overpayment, which Defendants had no right to collect and have no right to retain.

130.    Defendants, acting in concert, have wrongfully retained all benefits of the Overpayment, without Plaintiffs' consent and without providing any consideration.

131.    As a result of the foregoing, Defendants have been unjustly enriched in the amount of the Overpayment.  It would be in opposition to equity and good conscience to permit Defendants to retain such enrichment.

132.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of the Overpayment plus additional damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**<ins>COUNT IX</ins>**
**Promissory Estoppel**
**(Against All Defendants)**

133.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 132 above as if fully set forth herein.

134.    Defendants made multiple clear and unambiguous promises to Plaintiffs, which the Plaintiffs reasonably relied upon to their detriment; specifically entering into the merchant cash advance transactions and remitting the Overpayment to Defendants.

135.    Defendants, acting in concert, promised Plaintiffs the "15% rate" if Plaintiffs entered into the merchant cash advance transactions.

136.    Defendants, acting in concert, promised Plaintiffs in the Letters of Guarantee that they would provide "discounts" that would reduce the amount due under the respective merchant cash advance transactions to the amount "loaned" from Defendants plus 15 percent rather than

the rates contemplated in the merchant cash advance agreements with Ace Funding and Green Note.  The aggregate amount of Defendants' promised "discount" is $232,050.

137.    Defendants, acting in concert, sent emails on January 4, 2019 and January 11, 2019, promising that if Plaintiffs succumbed to Defendants' demand to remit the Overpayment (represented to be in satisfaction of Defendants' false liens), that Defendants would subsequently refund that Overpayment.

138.    On January 17, 2019, Defendants, acting in concert again promised to reimburse the Overpayment to the Plaintiffs.

139.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of the Overpayment plus additional damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

140.    The damages Plaintiffs' sustained are the result of Defendants' promises and Plaintiffs' reasonable reliance on those promises.

## COUNT X
### Money Had and Received
### (Against All Defendants)

141.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 140 above as if fully set forth herein.

142.    Each of the Defendants, acting in concert, received money belonging to Plaintiffs in the form of the Overpayment, which was wrongfully and unlawfully obtained by Defendants through fraudulent misrepresentations.

143.    Defendants, acting in concert, acknowledged that Plaintiffs have the sole right to own and sole right to possess the Overpayment and promised to return it both before and after the Overpayment was made.

144.   Each Defendant has benefitted and continues to benefit from the use of Plaintiffs' money, which they continue to withhold for their own use and benefit, including in furtherance of their fraudulent scheme.  Plaintiffs continue to be wrongfully and unlawfully deprived of the use and benefit of their money.

145.   Based upon the Defendants' fraudulent, unlawful and unethical conduct, it would be against equity and good conscience to permit any Defendant to keep and retain the Overpayment which Defendants wrongfully and unlawfully obtained and withhold.

146.   As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of the Overpayment plus additional damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

### COUNT XI
### Deceptive Trade Practices
### (Against All Defendants)

147.   Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 146 above as if fully set forth herein.

148.    New York General Business Law §349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

149.   In furtherance of their fraudulent scheme, each of the Defendants, acting in concert, have and continue to commit multiple deceptive acts and/or practices, including coercing Plaintiffs' payment of the Overpayment by making fraudulent and intentionally misleading statements on which Plaintiffs reasonably relied.

150.   Defendants knowingly and intentionally communicated, by telephone and email, false, materially misleading and fraudulent statements to Plaintiffs (i) falsely promising "discounts" that Defendants had no intention of honoring and misrepresenting the number of

years that Defendants had been in business for the purpose of inducing Plaintiffs into entering into the merchant cash advance transactions with Defendants and (ii) falsely misrepresenting that Plaintiffs were required to make the Overpayment in order for Defendants to extinguish liens on Plaintiffs' property – liens that Defendants did not actually hold – and that Defendants would promptly refund this Overpayment once remitted, for the purpose of inducing Plaintiffs to remit the Overpayment.

151.    Defendants wrongfully removed money from Plaintiffs' bank accounts in excess of amounts owed, if any, or as permitted by applicable law.

152.    Defendants knowingly and intentionally provided Plaintiffs with false accountings of amounts owed in order to induce them to remit money in excess of amounts actually owed or permitted by applicable law.

153.    Defendants wrongfully represented that they held security interests on Plaintiff's property and refused to release those false security interests on Plaintiffs' assets in order to extort and coerce Plaintiffs to remit money in excess of amounts actually owed or permitted by applicable law, specifically, the Overpayment.

154.    Defendants' actions were materially misleading and caused Plaintiffs to (i) enter into merchant cash advance transactions that they would not have entered into but for being misled, (ii) provide Defendants with access to bank accounts from which Defendants improperly removed funds, (iii) remit funds to Defendants that were not owed to Defendants, and (iv) incur expenses and attorneys' fees to address Defendants' wrongful conduct and to recover amounts wrongfully collected and withheld by Defendants.

155.    Plaintiffs suffered damages as the direct and proximate result of Defendants' deceptive acts, including but not limited to (i) the Overpayment, (ii) the excessive fees paid to

Defendants, and (iii) the "finance charges" paid to Defendants.  Plaintiffs have also suffered lost profits and have incurred substantial costs and attorneys' fees.

156.    Numerous   other   merchants/customers   in   various   jurisdictions   with   whom Defendants conducted business have filed complaints making substantially similar claims against Defendants, premised on and alleging Defendants' fraudulent, predatory and criminal conduct.

157.    Defendants' deceptive acts and practices have severe ramifications for the public at large and are harmful to the general public interest for a multitude of reasons, including but not limited to Defendants' direct abuse of legal process, diminishment of the public trust and faith in the small business merchant financing community, impairment of the functioning and success of small businesses, and direct violations of New York and Federal law.

**COUNT XII**
**Aiding and Abetting**
**(Against All Defendants)**

158.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 157 above as if fully set forth herein.

159.    Each of the Defendants are liable to Plaintiffs for tortious and fraudulent conduct, including  but  not  limited  to  each  Defendant's  liability  for  fraud,  fraudulent  inducement, conversion, civil conspiracy and deceptive trade practices.

160.    Each  Defendant  had  full  knowledge  of  the  tortious  and  fraudulent  conduct committed in concert and in furtherance of their common fraudulent scheme perpetrated against the Plaintiffs, and each Defendants engaged in such misconduct, providing substantial assistance to each other in defrauding Plaintiffs.

161.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of (i) the Overpayment, (ii) the excessive fees paid to Defendants, and (iii) the

"finance charges" paid to Defendants.  Plaintiffs have also suffered lost profits and have incurred substantial costs and attorneys' fees.

### COUNT XIII
### Negligent Misrepresentation
### (Against All Defendants)

162.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 161 above as if fully set forth herein.

163.    By purporting to enter into the merchant cash advance transactions, by accepting Plaintiffs' money, including the Overpayment, and by promising to hold and return the Overpayment, the Defendants created a relationship whereby Defendants had a duty to provide Plaintiffs with true and correct information about amounts owed as well as a duty to return the Overpayment when promised.

164.    The Defendants breached their duty to the Plaintiffs by misrepresenting that Plaintiffs would receive the "discounts" promised in the Letters of Guarantee, by providing false accountings misrepresenting amounts owed, by demanding that Plaintiffs remit the Overpayment, and by misrepresenting that the Entity Defendants would return the Overpayment when promised.

165.    Plaintiffs materially relied upon these misrepresentations in entering into the merchant cash advance transactions and in remitting the Overpayment.

166.    At all relevant times, Plaintiffs' reliance on Defendants' misrepresentations was objectively and subjectively reasonable.

167.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of (i) the Overpayment, (ii) the excessive fees paid to Defendants, and (iii) the "finance charges" paid to Defendants.  Plaintiffs have also suffered lost profits and have incurred substantial costs and attorneys' fees.

## COUNT XIV
### Constructive Trust
### (Against All Defendants)

168.   Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 167 above as if fully set forth herein.

169.   By purporting to enter into the merchant cash advance transactions; by accepting Plaintiffs' money, including the Overpayment; by fraudulently inducing Zyppah to grant Ace Funding and Green Note access to its bank accounts; and by expressly promising to hold and return the Overpayment, the Defendants created and/or occupied a confidential and/or fiduciary relationship with respect to Plaintiffs and the funds received from Plaintiffs.

170.   Plaintiffs remitted the Overpayment in reliance upon the express understanding and agreement that the Entity Defendants would hold and promptly return the Overpayment.

171.   Defendants were unjustly enriched by their receipt and wrongful retention of the Overpayment to the detriment of Plaintiffs.

172.   Defendants' fraudulent conduct warrants imposition of a constructive trust for all funds they received from Plaintiffs in excess of the funding payments Defendants provided plaintiffs, which funds they continue to wrongfully and unlawfully withhold.

## COUNT XV
### Accounting
### (Against All Defendants)

173.   Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 172 above as if fully set forth herein.

174.   By purporting to enter into the merchant cash advance transactions; by accepting Plaintiffs' money, including the Overpayment; by fraudulently inducing Zyppah to grant Ace Funding and Green Note access to Zyppah's bank accounts; and by expressly promising to hold and return the Overpayment, the Defendants created and/or occupied a confidential and/or fiduciary relationship with respect to Plaintiffs and the Overpayment.

44

175.   By virtue of the confidential and/or fiduciary relationship Defendants created or occupied and by virtue of Defendants' unjust enrichment by wrongfully and unlawfully withholding the Overpayment, Plaintiffs are entitled to an accounting of the funds they entrusted to Defendants.

**COUNT XVI**
**Breach of Contract**
**(Against Entity Defendants)**

176.   Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 175 above as if fully set forth herein.

177.   Plaintiffs, additionally and alternatively, allege that the Final Green Note Documents and the Final United Ace Documents, between the Entity Defendants, on the one hand, and the Plaintiffs, on the other hand, are binding contracts supported by adequate consideration.

178.   Plaintiffs fully complied with all conditions precedent and otherwise fulfilled and satisfied all of their obligations under the Final Green Note Documents and the Final United Ace Documents, entitling Plaintiffs to "discounts" pursuant to each of the Letters of Guarantee.

179.   Under the Final Green Note Documents and Final United Ace Documents and their corresponding Letters of Guarantee, no Defendant had any right to demand, collect, withhold from or fail to return the Overpayment to the Plaintiffs.

180.   By demanding, collecting, withholding and failing to return the Overpayment, the Entity Defendants (with the aid and assistance of the Principal Perpetrators) thereby breached the terms of the Final Green Note Documents and Final United Ace Documents, including their respective Letters of Guarantee.

181.   As a direct and proximate result of the foregoing, Plaintiffs have been damaged in the amount of no less than the Overpayment plus additional damages in an amount to be proven at trial, plus interest, costs and attorneys' fees.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants as follows:

A.      For entry of Judgment in Plaintiffs' favor on Counts I – XVI of this Amended Complaint;

B.      For an Award against Defendants for all damages to which Plaintiffs may be entitled, including incidental damages, compensatory damages, and consequential damages;

C.      For an Award of punitive damages;

D.      For an Award of treble damages pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) and/or New York General Business Law §349(h);

E.      For Appointment of a receiver over the Entity Defendants and their assets pursuant to this Court's equitable powers under Federal common law or New York CPLR § 6401 as permitted by Rules 64 and 66 of the Federal Rules of Civil Procedure;

F.      For an Order requiring an accounting of all monies Plaintiffs' remitted to Defendants;

G.      For an Order creating a constructive trust holding all monies Plaintiffs remitted to Defendants in excess of the funding Defendants provided;

H.      For costs and attorneys' fees, including pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) and/or New York General Business Law §349(h);

I.      For prejudgment and post-judgment interest according to law; and,

J.      For such other and further relief as the Court may deem proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand trial by jury of all issues so triable.


Dated: April 3, 2019
      New York, New York

                              **ICE MILLER LLP**
                              Attorneys for Plaintiffs,


                   By:  /s/Louis DeLucia
                         Louis DeLucia
                         Justin E. Klein
                         Alyson Fiedler
                         1500 Broadway, 29th Fl.
                         New York, NY 10036
                         Tel. (212) 824-4973
                         Fax: (212) 824-4974
                         Justin.Klein@icemiller.com

**<u>VERIFICATION</u>**

I, Jerry Washburn, serve as the Chief Financial Officer of Zyppah and am an authorized signatory for Plaintiffs in the present case.  I am a citizen of the United States and a resident of the State of Arizona.  I have read the foregoing Complaint and know the contents thereof.  The contents of the foregoing Complaint are true to my own knowledge except as to matters therein stated upon information and belief and as to those matters, I believe them to be true.

Subscribed and Sworn to
before me on

April 3, 2019

Jerry Washburn
Chief Financial Officer, Zyppah

NOTARY PUBLIC

LATISHA DELORES CHAVEZ
Notary Public - California
Los Angeles County
Commission # 2192781
My Comm. Expires Apr 21, 2021